**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| RONALD C. RHONE, | ) | CASE NO. 1:11-cv-2428 |
| | ) | |
| Plaintiff, | ) | JUDGE PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Ronald P. Rhone ("Plaintiff"), *pro se*, challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"),

denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United

States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be REVERSED and this case be

REMANDED for further proceedings consistent with this Report and Recommendation.

# I.  PROCEDURAL HISTORY

On February 14, 2008, Plaintiff filed applications for a POD, DIB, and SSI and alleged a disability onset date of August 1, 2006.  (Tr. 12.)  The applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 12.)  On October 19, 2009, an ALJ held Plaintiff's hearing.  (Tr. 12.)  Plaintiff appeared, was represented by an attorney, and testified. (Tr. 12.)  On November 24, 2009, the ALJ found that Plaintiff was not disabled prior to May 1, 2008, but became disabled on that date and continued to be disabled through the date of the decision.  (Tr. 19.)  The ALJ relied solely on Medical Vocational Rule 202.14[1] to determine that Plaintiff was not disabled prior to May 1, 2008.  (Tr. 19.)  On September 12, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 2.)

On November 9, 2011, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On May 23, 2012, Plaintiff filed his Brief on the Merits.  (Doc. No. 14.)  On July 9, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 16.)  Plaintiff did not file a reply brief.

Plaintiff does not clearly articulate the bases for his challenge to the Commissioner's final decision.  He only states on one page that he originally filed for benefits in Nevada in November 2006; he was hospitalized in Nevada in July and August 2006; he continued to undergo hospitalization and treatment for heart disease,

---

[1] Medical Vocational Rule 202.14 provides that a claimant is not disabled when he is closely approaching advanced age, is a high school graduate or more, and has non-transferable "skilled" or "semi-skilled" skills from past work experience.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2.

2

hypertension, anxiety, and depression; and he underwent hospitalization and treatment in 2008 and 2009.  However, *pro se* plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings.  *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999).  Accordingly, the Court construes Plaintiff's Brief on the Merits to contend that substantial evidence does not support the Commissioner's final decision.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was 56 years old on the date of his hearing.  (Tr. 1378.)  He had at least a high school education, could speak in English, and had past relevant work as a kitchen worker.  (Tr. 18.)  Plaintiff worked as a medical clerk from 1988 to 2006; and he worked part-time at a gas station from June 2007 to October 2008.  (Tr. 145, 1379.)

### B.   Medical Evidence

Plaintiff asserts that he has been disabled by depression, anxiety, a "heart problem," and "bad knees."  (Tr. 1380.)  The following summary of medical evidence will relate to those conditions prior to May 1, 2008.

#### 1.   Depression and Anxiety

On August 21, 2004, Plaintiff presented to "resident" Russell Lewis, Jr. and psychiatrist Linda C. Bond[2] with complaints of sadness and suicidal ideation.  (Tr. 1297-1302.)  Mr. Lewis and Dr. Bond indicated the following.  Plaintiff's heavy alcohol and cocaine use over the past two months related directly to his symptoms.  (Tr. 1301.)  Plaintiff appeared to improve after admission, as his depressive mood and suicidal

---

[2] The record does not clearly indicate Mr. Lewis's and Ms. Bond's credentials.

3

ideation resolved in a substance-free environment.  (Tr. 1301.)

On February 6, 2007, psychiatrist David A. Orea, M.D., authored a note and indicated the following.  (Tr. 1163.)  Plaintiff had presented to Dr. Orea twice—on August 23, 2006, and on the date of the note.  (Tr. 1163.)  Plaintiff had a history of alcohol and cocaine abuse but had managed to remain sober since 2005.  (Tr. 1163.) Plaintiff also had been diagnosed with a depressive disorder not otherwise specified, which interfered with Plaintiff's ability to work.  (Tr. 1163.)  Plaintiff "ha[d] not been able to work since June of 2006."  (Tr. 1163.)

On November 8, 2007, Plaintiff underwent a mental health consultation with clinical psychologist Neal F. Kozlowski.[3]  (Tr. 793-95.)  Dr. Kozlowski indicated the following.  Plaintiff had contact with Veterans Affairs psychiatric providers since 1997 and had received outpatient psychiatric treatment from psychiatrist Sybille Marqua since 2002.  (Tr. 794.)  Plaintiff's "active problems" included alcohol dependence, cocaine dependence, a personality disorder not otherwise specified, and a depressive disorder not elsewhere classified.  (Tr. 794.)

Also on November 8, 2007, Plaintiff presented to Dr. Marqua, and Dr. Marqua indicated the following.[4]  (Tr. 795-97.)  Plaintiff ran out of medication in April of that year and began feeling "more depressed."  (Tr. 796.)  He denied past use of cocaine and alcohol.  (Tr. 796.)  Dr. Marqua diagnosed Plaintiff with a depressive disorder, alcohol abuse, and cocaine dependence; and she assigned Plaintiff a Global Assessment of

---

[3] The record does not clearly indicate Dr. Kozlowski's credentials.

[4] The record does not clearly indicate Dr. Marqua's credentials.

4

Functioning ("GAF") score of 50.[5]  (Tr. 796.)

On December 13, 2007, clinical nurse specialist Mary Goletz updated Plaintiff's counseling progress notes and indicated that Plaintiff reported his depression and anxiety had decreased significantly and that Plaintiff denied depression and anxiety. (Tr. 666.)  Ms. Goletz further indicated the following.  Plaintiff was working part-time at a gas station; and he used anti-depressants such as Citalopram, as well as coping skills, to decrease or eliminate his anxiety.  (Tr. 666.)  Plaintiff successfully completed anger management classes (Tr. 670), and denied needing treatment for alcohol dependence (Tr. 667, 669).

On December 17, 2007, Plaintiff underwent a mental health consultation with licensed practical nurse Debra J. Bolar, and Ms. Bolar indicated the following.  (Tr. 654-55.)  Plaintiff was alert and oriented and compliant with his medication.  (Tr. 655.)  He denied suicidal ideation and "continued" to rated his depression at between 0 and 2 on a scale to 10 in severity.  (Tr. 655.)  He denied signs or symptoms of depression and felt "pretty good."  (Tr. 655.)  He appeared bright and cheerful; was independent in his activities of daily living; and denied pain, discomfort, or trouble sleeping.  (Tr. 655.)

Also on December 17, 2007, Plaintiff presented to Dr. Marqua, and Dr. Marqua indicated the following.  (Tr. 1290-92.)  Plaintiff's appearance and behavior were essentially normal.  (Tr. 1291.)  Plaintiff rated his "mood" at between 5 and 6 on a scale

---

[5]  A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

to 10 in severity.  (Tr. 1291.)  He had engaged in a Psychosocial Residential

Rehabilitation Treatment Program ("PRRTP") and did well in the program.  (Tr. 1291.)

Dr. Marqua diagnosed Plaintiff with a major depressive disorder and alcohol and

cocaine abuse in remission; and Dr. Marqua discharged Plaintiff as "competent and

employable."  (Tr. 1292.)

On December 21, 2007, Plaintiff presented to Dr. Marqua for medication

management and brief psychotherapy, and Dr. Marqua indicated the following.  (Tr.

625.)  Plaintiff was "doing well," as his mood was stable, he remained hopeful of his

future, he was compliant with his medication and suffered no side effects, and he was

compliant with his groups and appointments.  (Tr. 625.)  Dr. Marqua's observations of

Plaintiff's psychological status remained consistent through April 2008.  (*See* Tr. 549.)

Plaintiff also engaged in occupational therapy, and on February 6, 2008,

occupational therapist Renee Rothhaas reported that Plaintiff was assertive for needs,

exhibited good attention to tasks, and was social with peers and staff.  (Tr. 602.)

## 2. Heart Condition

On August 5, 2006, Plaintiff presented to an emergency room with complaints of

weakness and shortness of breath with dyspnea on exertion.  (Tr. 1178.)  Dr. Larry

Poon, M.D., attended to Plaintiff and indicated Plaintiff denied chest pain or pressure-

like symptoms across his chest.  (Tr. 1178.)  Dr. Poon diagnosed Plaintiff with

"weakness" and instructed Plaintiff to "[d]rink lots of fluids" and return immediately if his

symptoms worsened.  (Tr. 1179.)

On January 18, 2007, Plaintiff presented to Dr. Rustica A. Bernardino, M.D., for

6

a follow-up on laboratory test results.  (Tr. 1167-68.)  Dr. Bernardino indicated that Plaintiff's blood pressure was 106 over 80 and that Plaintiff had high levels of cholesterol and triglycerides.  (Tr. 1167.)  Dr. Bernardino assessed Plaintiff with hyperlipidemia and noted that Plaintiff was able to ambulate.  (Tr. 1167-68.)

On December 12, 2007, Plaintiff presented to physician Antoinette S. Abou-Haidar[6] with a chief complaint of a rash on his chest.  (Tr. 676.)  Dr. Abou-Haidar indicated the following.  Plaintiff also complained of chest pain.  (677.)  Plaintiff had undergone a stress test in 2002; the test results indicated that Plaintiff had a left ventricle ejection fracture of 44%; and at that time Plaintiff refused a cardiac catheter. (Tr. 677.)  Plaintiff had been admitted to a hospital in Nevada in 2006 for chest pain, whereupon Plaintiff again refused a cardiac catheter.  (Tr. 677.)  A cardiology report from December 11, 2007, indicated stable angina.  (*See* Tr. 676.)  Plaintiff reported that he had stopped taking his cardiac medication since June 2007, and that his present chest pain abated after admission.  (Tr. 677.)

On January 11, 2008, Plaintiff underwent a cardiac stress test that was administered by registered nurse Michele Wong.  (Tr. 615-18.)  Ms. Wong indicated that Plaintiff suffered only shortness of breath during the test, which resolved with rest. (Tr. 618.)  Under a section of the test report titled "FUNCTIONAL CAPACITY," Ms. Wong indicated "No impairment."  (Tr. 618.)

### 3.  Knees

On May 21, 2008, Plaintiff underwent a physical therapy consultation with

---

[6] The record does not clearly indicate Dr. Abou-Haidar's credentials.

7

physical therapist Charles A. Polomsky.  (Tr. 523-24.)  Mr. Polomsky indicated that

Plaintiff reported the following.  Plaintiff suffered "a lot of knee pain[] medially."  (Tr.

523.)  The pain became so strong that he had to use his arms to push himself up and

out of chairs; and he sometimes required the use of a cane to walk.  (Tr. 523.)  He did

not, however, have knee pain for the last two weeks.  (Tr. 523.)  The pain was

intermittent, and he treated the pain with hot baths and "tiger balm."  (Tr. 523.)

Upon physical examination, Mr. Polomsky indicated the following.  Plaintiff

ambulated independently without need of an assistive device and exhibited no

tenderness upon palpation.  (Tr. 524.)  The range of motion in Plaintiff's knees was

within normal limits, and Plaintiff exhibited full strength in knee flexion and extension.

(Tr. 524.)  In sum, Mr. Polomsky indicated that the assessment of Plaintiff's knees was

"normal" and that Plaintiff did not need physical therapy at that time.  (Tr. 524.)

### 4.    State Agency Opinions

On April 12, 2008, state agency reviewing psychologist Karla Voyten, Ph.D.,

performed a Psychiatric Review Technique and assessed Plaintiff's mental residual

functional capacity ("RFC").  (Tr. 1243-59.)  Dr. Voyten indicated the following in her

Psychiatric Review Technique.  Dr. Voyten evaluated Plaintiff under Listing 12.04

regarding affective disorders, Listing 12.08 regarding personality disorders, and Listing

12.09 regarding substance addiction disorders.  (Tr. 1243.)  She found that Plaintiff

suffered a major depressive disorder not otherwise specified, a personality disorder not

otherwise specified, and cocaine and alcohol dependence in remission.  (Tr. 1251.)

She concluded that Plaintiff had moderate difficulties in maintaining concentration,

persistence, or pace; mild difficulties in maintaining social functioning; mild restrictions

in activities of daily living; and no episodes of decompensation of extended duration. (Tr. 1253.)

In her mental RFC assessment, Dr. Voyten indicated the following.  Plaintiff was moderately limited in his abilities to:  understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (Tr. 1257-58.)  There was no evidence of limitation in Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors.  (Tr. 1258.) Plaintiff otherwise was not significantly limited.  (Tr. 1257-58.)  Dr. Voyten concluded that Plaintiff was able to perform simple one- to two-step tasks with the availability of repetition of instructions, and routine work with only occasional changes.  (Tr. 1259.) She found Plaintiff only partially credible because his allegations of hearing voices and not trusting other people were not supported by the record; and because he was able to perform activities of daily living independently and work one day a week.  (Tr. 1259.)

On April 16, 2008, state agency reviewing physician William Bolz, M.D., assessed Plaintiff's physical RFC and indicated the following.  (Tr. 1235-42.)  Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; and sit, stand, and walk for about 6 hours in an 8-hour workday with normal breaks.  (Tr. 1236.)  His abilities to push and pull were unlimited except to the extent to which Plaintiff was limited in his abilities to lift and carry.  (Tr. 1236.)  He could frequently climb ramps and

9

stairs and balance; and he could occasionally climb ladders, ropes, and scaffolds and kneel, crouch, and crawl.  (Tr. 1237.)  He had no manipulative, visual, communicative, or environmental limitations.  (Tr. 1238-39.)  Dr. Bolz noted that there were no objective findings in the record to support Plaintiff's complaints of chest pain and limitations in activities of daily living.  (Tr. 1240.)

On May 8, 2008, state agency medical consultant Regina Bowgierd, M.D., agreed with Dr. Voyten's findings in her Psychiatric Review Technique and mental RFC assessment.  (Tr. 1226-28.)  Dr. Bowgierd observed that Plaintiff's depression was stable with medication and his cognitive abilities were intact when he was sober.  (Tr. 1231.)  In addition, Dr. Bowgierd indicated that Plaintiff "can sustain detailed 3-4 step tasks, not just simple, unskilled work."  (Tr. 1231.)

On May 9, 2008, state agency consultant Mila Bacalla, M.D., affirmed Dr. Bolz's physical RFC findings.  (Tr. 1223.)  In addition, Dr. Bacalla found that Plaintiff "has no limitation in stooping."  (Tr. 1223.)

On May 19, 2008, Dr. Voyten amended her findings upon further review of the medical record and concluded that Plaintiff could perform detailed three- to four-step tasks in environments without time or production pressure.  (Tr. 1220.)

On July 25, 2008, state agency consultative psychologist J. V. Rizzo, Ph.D., opined that Plaintiff "is mentally capable of understanding and remembering simple and semi-skilled tasks and activities involving several steps," but "remains vulnerable to deterioration in performance in the face of time/production pressures and would for the latter reason experience significant restrictions in work circumstances."  (Tr. 1214.)

On December 4, 2008, state agency reviewing psychologist David Dietz, Ph.D.,

10

performed a Psychiatric Review Technique and mental RFC assessment of Plaintiff to resolve any confusion about Dr. Voyten's conclusions regarding Plaintiff's mental RFC. (Tr. 1135-51.)  Dr. Dietz's findings were essentially the same as Dr. Voyten's findings, and Dr. Dietz confirmed Dr. Voyten's conclusion that Plaintiff "appear[ed] capable of complet[ing] mildly complex tasks that involve 3 to 4 steps that do not have strict production standards or schedules."  (Tr. 1151.)

### C.    Plaintiff's Hearing Testimony

Plaintiff testified at his hearing as follows.  Plaintiff completed four years of college and obtained a degree in African Studies.  (Tr. 1379.)  He was a yeoman administrative clerk in the United States Navy; and, as a civilian, he worked as a medical clerk in the Veteran's Affairs hospital.  (Tr. 1379.)  He worked at a gas station for eight hours a week between June 2007 and October 2008.  (*See* Tr. 1379.)

Plaintiff was honorably discharged from the Navy after he had a verbal altercation with a co-worker.  (Tr. 1387.)  A year prior to that incident, he had an "adverse reaction to stress," was hospitalized, and underwent a heart catheterization. (Tr. 1387.)  At that time, it was unclear and undetermined whether he suffered a heart attack or a panic attack.  (Tr. 1387.)

Plaintiff did not believe that he had a problem with alcohol and cocaine; rather, he believed his primary problem was mental illness and that he used such substances to alleviate stress and depression.  (Tr. 1380-81.)  He resigned from employment in 2006 because his depression caused him to miss work often and he could not handle the stress of his job.  (Tr. 1381.)  However, while he was "on the job" he "could do the

work." (Tr. 1382.)

Plaintiff lived alone.  (Tr. 1386.)  His average day proceeded as follows.  He arose from bed, prepared breakfast, and sometimes washed clothes or cleaned his apartment.  (Tr. 1383.)  He also watched television.  (Tr. 1383.)  If he had occupational therapy classes scheduled for the day, he would ready himself and then travel to the Veterans Affairs hospital where the classes were held.  (*See* Tr. 1383.)  After occupational therapy, he returned home, prepared dinner, cleaned the kitchen, and either watched television or read until bedtime.  (Tr. 1383.)

Plaintiff's depression, however, caused him to stay in bed between 20 and 25 days a month.  (Tr. 1383.)  Although he enjoyed his occupational therapy classes and tried to attend all of them, he sometimes "didn't feel good" and notified the Veterans Affairs hospital that he "wasn't going to make it" to class.  (Tr. 1384.)

Plaintiff used to hear voices, but recently he had not heard voices often because he was on medication.  (Tr. 1389.)

Plaintiff also had "a hard time dealing with people."  (Tr. 1386.)  He felt that he was "being pressured to the point of just not being able to reason."  (Tr. 1386.)  He "put forth a lot of effort to try and solace people but . . . it doesn't do any good" and his "effort is just wasted."  (Tr. 1386.)

Further, Plaintiff's knees ached and were "not strong."  (Tr. 1390.)  His knees hurt with prolonged standing, such as for two or three hours at a time.  (Tr. 1390-91.)  The pain would subside when he sat.  (Tr. 1391.)

Plaintiff took Citalopram for his depression, beta blockers for his heart palpitations, Lisinopril for his heart generally, and nitroglycerine two or three times a

12

month for his chest pain.  (Tr. 1384.)  He took aspirin, ibuprofen, and acetaminophen for his knee pain; and he used capsaicin cream on his legs.  (Tr. 1384.)  The nitroglycerine and "other" medications caused headaches and constipation.  (Tr. 1385.)  Nevertheless, his medications helped his emotional condition.  (Tr. 1388.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905

F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset date.

3.  Since the alleged onset date of disability, August 1, 2006, the claimant has had the following severe impairments: major depressive disorder; personality disorder; degenerative joint disease; and polysubstance abuse.

4.  Since the alleged onset date of disability, August 1, 2006, the claimant has not had an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that since August 1, 2006, the claimant has had the residual functional capacity to perform light work . . . except he can lift, carry, push and pull no more than ten pounds frequently and 20 pounds occasionally.  He

can sit, stand, and walk up to six hours each in an eight hour work day.  The claimant can frequently climb ramps and stairs, however, he can perform no more than occasional climbing of ladders, ropes and scaffolds. The claimant can perform frequent balancing, and occasional kneeling, crouching, and crawling.  He can perform no more [than] detailed three to four step tasks with repetition of instructions available.  He can perform low stress work involving no production quotas or piece work. He must have no more than occasional adjustments to change.

6.     Since August 1, 2006, the claimant has been unable to perform any past relevant work.

7.     Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. Applying the age categories non-mechanically, and considering the additional adversities in this case, on May 1, 2008, the claimant's age category changed to an individual of advanced age.

. . . . .

9.     Prior to May 1, 2008, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills. Beginning on May 1, 2008, the claimant has not been able to transfer job skills to other occupations.

10.    Prior to May 1, 2008, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant could have performed.

11.    Beginning May 1, 2008, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform.

12.    The claimant was not disabled prior to May 1, 2008 . . . but became disabled on that date and has continued to be disabled through the date of this decision.

13.    The claimant's substance use disorder(s) is not a contributing factor

15

material to the determination of disability.

14.     There is substantial and convincing evidence that the claimant would have difficulty in managing benefits and a representative payee should be appointed to manage payments in the claimant's best interest.

(Tr. 14-19.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by

16

substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

> **B.**    **Whether the Commissioner's Final Decision is Supported by Substantial Evidence**

For the following reasons, the ALJ's findings at steps one through four of his analysis are supported by substantial evidence.  The ALJ found that none of Plaintiff's impairments, either alone or in combination, met or medically equaled an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") because:  no medical source who examined Plaintiff or reviewed his records made such a finding; the evidence supported the conclusion that Plaintiff had only mild limitations in his activities of daily living and in maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace, and no episodes of decompensation; and Plaintiff's mental impairments did not meet the "C" criteria applicable to the mental disorders in the Listings.  (Tr. 15.)  The ALJ further considered Plaintiff's depression, anxiety, cocaine and alcohol dependence, knee pain, hypertension, chest pain, and hyperlipidemia in his assessment of Plaintiff's RFC.  (*See* Tr. 16-18.)

The ALJ found that Plaintiff's allegations that his impairments prevented him from sustaining basic work activities were not fully credible.  (Tr. 16.)  The ALJ specifically discussed, among other things, the following record evidence in support of his assessment of Plaintiff's credibility and his RFC determination.  Plaintiff's depression and anxiety abated with inpatient treatment.  (Tr. 16.)  Although Plaintiff's clinical nurse was concerned about Plaintiff's ability to adhere to his course of treatment once he left inpatient care, Plaintiff thereafter entered a domiciliary program and Dr.

17

Marqua consistently indicated Plaintiff was doing well on medication through May 2008.
(Tr. 17.)  Indeed, Dr. Marqua indicated that Plaintiff was "employable."  (Tr. 17.)  The
staff at Plaintiff's occupational therapy sessions noted that Plaintiff exhibited good
attention to tasks and socialized well with others.  (Tr. 17.)  Mental health professionals
who provided psychotherapy to Plaintiff consistently indicated that Plaintiff did not
report delusions or hallucinations.  (Tr. 16-17.)  During a stress test on January 11,
2007, Plaintiff exhibited only shortness of breath that abated with rest.  (Tr. 17.)  An
examination on January 18, 2007, revealed that Plaintiff had normal blood pressure and
could ambulate; and there was no evidence that Plaintiff complained of pain or
shortness of breath.  (Tr. 17.)  Although Plaintiff complained of pain in his knees, he
reported that the pain abated with medication.  (Tr. 17.)  And Plaintiff's testimony that
he did not like being around others was inconsistent with the record, which revealed
that Plaintiff was "always pleasant and social."  (Tr. 18.)

The ALJ ultimately adopted the opinions of the state agency medical and
psychological consultants because they were well detailed and consistent with the
record evidence.  (Tr. 17.)  In short, the evidence upon which the ALJ relied at steps
one through four of his analysis is more than a scintilla of evidence that reasonably
supports his findings.[7]

---

[7] The ALJ did not mention Dr. Orea's February 6, 2007, comment that Plaintiff
had not been able to work since June 2006.  Nevertheless, the Court finds no
harmful error in this omission.  An ALJ can consider all the evidence without
directly addressing in his written decision every piece of evidence submitted by
a party; and an ALJ need not make explicit credibility findings as to each bit of
conflicting testimony so long as his factual findings as a whole show that he
implicitly resolved such conflicts.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F.
App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v.*

However, for the following reasons, the ALJ's finding at step five is not supported by substantial evidence.  At the fifth step of the sequential analysis, the Commissioner bears the burden of establishing that, given a claimants age, education, work experience, impairments, and limitations, there exists work in the national economy that the claimant can perform.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).  The Commissioner may meet this burden by reference to the Medical Vocational Guidelines ("the grids") unless the claimant suffers from nonexertional limitations that significantly limit the range of work permitted by his exertional limitations.  *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771 (6th Cir. 1987).  In other words, "where a claimant has nonexertional impairments alone or in combination with exertional limitations, the ALJ must treat the grids as only a framework for decisionmaking, and must rely on other evidence to determine whether a significant number of jobs exist in the national economy that a claimant can perform."  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008).  "A vocational expert should be consulted when a claimant has severe combined exertional and nonexertional limitations."  *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 792 (N.D. Ohio 2002).

Here, the ALJ determined that Plaintiff could perform a significant number of jobs

---

*N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)).  It appears that Dr. Orea's comment merely parrots Plaintiff's allegation that he was not able to work since June 2006; and the ALJ's determination that Plaintiff was not fully credible is supported by substantial evidence.  Further, even if Dr. Orea's comment were deemed his own opinion, any failure to mention it would be harmless because it is unsupported by any clinical findings or explanation of Plaintiff's functional limitations, and it is inconsistent with substantial evidence in the record—including Dr. Marqua's comment on December 17, 2007, that Plaintiff was "competent and employable."

19

in the national economy prior to May 1, 2008, using only Medical Vocational Rule 202.14.  (Tr. 19.)  But the ALJ found that Plaintiff suffered nonexertional impairments and limitations:  the ALJ found that Plaintiff suffered a severe major depressive disorder and a severe personality disorder; and that although Plaintiff could perform light work, Plaintiff was limited to no more than detailed three- to four-step tasks with repetition of instructions available, low stress work involving no production quotas or piece work, and no more than occasional adjustments to change.  *See* 20 C.F.R. § 404.1569a(c)(1)(i) ("Some examples of nonexertional limitations or restrictions include . . . [y]ou have difficulty functioning because you are nervous, anxious, or depressed; [or y]ou have difficulty maintaining attention or concentrating."); S.S.R. 85-15, 1985 WL 56857, at *2 (S.S.A.) ("Mental impairments are generally considered to be nonexertional, but depressions and conversion disorders may limit exertion.").

   The ALJ explained that Plaintiff's "ability to perform all or substantially all of the requirements of [light] work was impeded by additional limitations," but that "the additional limitations had little or no effect on the occupational base of unskilled light work."  (Tr. 19.)  The ALJ did not cite any evidence in support of this conclusion; and the ALJ's nonexertional RFC findings contradict his conclusion that Plaintiff could perform all or substantially all of the requirements of light work.  *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) ("The ALJ found that plaintiff's residual functional capacity for sedentary work is limited to 'settings relatively free of atmospheric pollutants and irritants,' and the record admits of no evidence to the contrary.  This initial finding confutes the ALJ's later conclusion that plaintiff's nonexertional limitations do not significantly limit his capacity for sedentary work.").

20

In short, the ALJ's step five finding is not supported by the record.  As substantial evidence does not support the ALJ's conclusion that Plaintiff could perform other work that existed in significant numbers in the national economy prior to May 1, 2008, the Magistrate Judge recommends that the Commissioner's final decision be reversed and remanded so that an ALJ may obtain the testimony of a Vocational Expert upon which to base a step five finding.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and this case be REMANDED for further proceedings consistent with this Report and Recommendation.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  August 6, 2012

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**